**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

**School Board of Independent School District No. 11, Anoka-Hennepin,**

**Plaintiff,**

v.

**Sarah Pachl, a minor, by and through her parents and legal guardians, Kevin and Suzanne Pachl,**

**Defendants.**

**Civil No. 01-342 (SRN)**

**ORDER**

---

Nancy E. Blumstein, Esq., and Holly Lindquist Thomas, Esq., on behalf of Plaintiff.

Sonja D. Kerr, Esq., on behalf of Defendants.

---

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-entitled matter came before the undersigned United States Magistrate Judge on March 11, 2002, on Defendants' Motion for Summary Judgment (Doc. No. 20), Plaintiff's Motion for Summary Judgment (Doc. No. 26), and Plaintiff's Motion to Strike Defendant's Attachments A&C (Doc. No. 33).

Pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties waived their right to proceed before a United States District Judge, and voluntarily consented to have all proceedings in this case, including the entry of judgment, conducted and determined by the undersigned United States Magistrate Judge. It was so ordered by the Honorable Paul A. Magnuson, Judge for the United States District Court for the District of

MAY 1 0 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD MAY 1 0 2002
DEPUTY CLERK

Minnesota.

This Order addresses those motions.

## I. FACTUAL BACKGROUND

The Individuals with Disabilities Act (IDEA) provides federal funds to assist states in educating disabled children. In order to receive this funding, however, states must provide a free appropriate public education (FAPE) to all disabled students. 20 U.S.C. § 1412. FAPE is defined as

> special education and related services that–
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). At the beginning of every school year, each educational agency involved must have an individual education program (IEP) in effect for each child with a disability in its jurisdiction. 20 U.S.C. § 1414(d)(2)(A). The IDEA provides that students with disabilities may need assistive technology, and requires IEP teams to determine whether a child requires particular assistive technology devices and services. 20 U.S.C. §§ 1401(2) and 1414(d)(3)(B)(v).

Defendant Sarah Pachl is a ten-year-old public school student with developmental disabilities. She uses assistive technology equipment, specifically a device known as the TechSpeak, to augment her verbal communication.

### A. <u>Initial Request for Assistive Technology.</u>

On April 29, 1999, Defendants requested that Sarah be evaluated for assistive technology.

(IHO Due Process Hearing Findings of Fact (IHO FF), ¶ 7.) The District's Special Education Administrator, Sharon Meyerring, believed that more specific information was needed from the Pachls. Id. at ¶ 9. Specifically, the District wished to schedule an IEP team meeting to consider the requested evaluation. Id. at ¶ 10. The parents, however, did not believe an IEP meeting was a necessary prerequisite for an evaluation. Id. The District waited to schedule the IEP meeting until a due process hearing on an unrelated matter was resolved on June 2, 1999, on the grounds that the Parents had requested a "stay put" under the IDEA during the pendency of this hearing. Id. The District scheduled an IEP meeting for June 22, 1999, but the parents were unable to attend, because they were visiting Germany. Id. at ¶ 11. Consequently, the meeting was rescheduled for August 24, 1999. Id.

On June 11, 1999, Kevin Pachl wrote to Meyerring, stating that under 34 CFR 330.533(b), "the IEP team can conduct this review without a meeting." (Due Process Hearing (D.), Ex. 20.) On the attached Notice of Educational Evaluation/ Re-evaluation page that the District had sent, Pachl wrote, "I object to the proposed evaluation as violative of the IDEA for the reasons stated in my attached letter. . . I do want an assistive technology evaluation which request was made in writing and which is not even noted on the proposed evaluation plan. I am filing a complaint with the MDCFL (Minnesota Department of Children, Families & Learning) on this issue." Id. On August 4, 1999, Meyerring wrote to the Pachls, informing them that an assistive technology evaluation would be scheduled, and possible dates were August 19 or 24, 1999.

On or about August 6, 1999, Kevin Pachl received a letter from the MDCFL. (Affidavit of Sonja Kerr (Kerr Aff.), Ex. C). This letter was in response to Kevin Pachl's earlier complaint.

In the letter, the MDCFL concluded that "the director of special education unilaterally directed the development of the present level of performance statements and goals and objectives in the IEP dated April 1998 without sufficient opportunity for parental input and feedback from team members." Id at 11. In its Decision, the MDCFL also found that "[t]he District violated 34 C.F.R. § 300.343 through .347 by permitting the director of special education to make unilateral decisions regarding service and placement." Id.

On August 24, 1999, an IEP meeting was held. At the meeting, Kevin Pachl handed out the August 6, 1999 letter from the MDCFL. (Tr. 1107.) Kevin Pachl also objected to the presence of Cherie Peterson, the District's special education consultant, because, as he had alleged in his complaint to the MDCFL, he believed that she had intimidated District teaching staff. (Tr. 1109-11.) At the time of the meeting, Kevin Pachl did not know that Peterson was involved in assistive technology, and believed she was only a special education consultant. (Tr. 1110.) Kevin Pachl then read a prepared statement and left the meeting. (IHO FF, ¶ 12, D., Ex. 27.)

On August 27, 1999, Meyerring wrote to the Pachls, informing them that Peterson was the individual in charge of assistive technology for the District. (D., Ex. 29.) Meyerring further explained that Peterson had been invited to the meeting because, "we believed she was the best resource we could offer Sarah's IEP team as they planned her assessment in this area." Id. The Pachls were also informed that there would be another IEP team meeting held on September 14, 1999, in order to: (1) discuss development of an evaluation/reevaluation plan; (2) review the present IEP; and (3) discuss the request for an assistive technology assessment. Id. The letter also stated that "[w]hile we want and value your attendance and participation at this meeting, . . .

Sarah's IEP team will continue to meet and complete an assessment plan for her even if you choose to leave the meeting." Id.

At a separate September 10, 1999 meeting, Kevin Pachl handed Meyerring a letter stating he wanted the September 14, 1999 meeting rescheduled. (Tr. 1381.) Nevertheless, having received no notice of rescheduling, Kevin Pachl appeared on September 14, 1999, for the meeting. (Tr. 1382.) The meeting had been canceled, however, and was subsequently rescheduled for September 30, 1999. Id. At this time, there was also a dispute between the parties concerning a conciliation conference.[1] In a September 28, 1999 letter addressing the conciliation conference, Kevin Pachl informed Meyerring that the Pachls could not attend the September 30, 1999 IEP meeting, and asked that it be rescheduled. (D., Ex. 40.) In a September 29, 1999 letter, Meyerring informed the Pachls that the IEP meeting would be rescheduled for October 7, 1999. (D., Ex. 42.) In a September 29, 1999 letter, the MDCFL informed the Pachls that the Director of Special Education did not allow for an open team process, and that "[t]he fact that no notice was provided to the Parents, in response to their proposal, is additional evidence of a corrupted, non-compliant team process." (Kerr Aff., Ex. C-2.) After more correspondence concerning whether a conciliation conference should precede or entirely replace the IEP meeting, the IEP meeting was again rescheduled for October 20, 1999. (D., Ex. 51.)

On October 20, 1999, Kevin Pachl attended the IEP meeting. (Tr. 1122.) At the meeting, however, Kevin Pachl noticed that some of the proper team members, including speech therapist

---

[1]Defendants memorandum in support of summary judgment states that the dispute between the parties concerned whether the conciliation conference would be in addition to, or instead of an IEP meeting. In his Findings of Fact, however, the IHO refers to the conciliation conference as being "on an unrelated matter."

Diane Gallagher and Peterson, were not present. (Tr. 1123.) In addition, Kevin Pachl believed the team had brought the wrong IEP with it for the meeting. (Tr. 1125.) After asking additional questions, Kevin Pachl states that Sarah Pachl's case manager Barbara Hollom told him to "chill out." Id. Kevin Pachl subsequently left the meeting. But prior to leaving, he states that Nancy Blumstein told him the meeting would continue and a proposal would be developed. (Tr. 1126.)

Hollom states that at the time she became Sarah Pachl's case manager in the Fall of 1999, she did not know when the parents had requested an assistive technology evaluation. (Tr. 623.) She explained that she had only heard about that request in passing, and "all other discussion was totally about Sarah going to Hoover. The parents never once spoke to me about any kind of assessment at all, let alone augmentative communication." (Tr. 623-24.)

The MDCFL wrote to Kevin Pachl again on December 2, 1999. (Kerr Aff., Ex. C-3.) The Order section of this letter states, "[t]he District must immediately *cease and desist in permitting unilateral placement decisions to be made by the District staff and administration, outside of the IEP process.* By *December 10*, 1999, the District must submit documentation to this office *indicating how it has corrected this problem and has ensured it will not reoccur.*"

On December 14, 1999, Kevin Pachl attended a meeting to discuss Sarah Pachl being transferred to Hoover Elementary School (Hoover). (Tr. 1131.) At this meeting, there were staff members from Hoover who had not previously attended any of Sarah Pachl's IEP meetings. (Tr. 1134.) Assistive technology was not discussed during this meeting. Id.

Sarah Pachl began attending Hoover on December 17, 1999. (Tr. 1133.) On January 3, 2000, Kevin Pachl spoke with Elaine Bartolian, Hoover's principal. (IHO FF, ¶ 16, Tr. 1139-41.) He told her of his pending request for an assistive technology evaluation, and that he wished

the evaluation to be conducted by an outside party rather than the District. Id. Bartolian relayed the request to Peterson. (IHO FF, ¶ 17.) Peterson responded with a letter to the Pachls dated January 18, 2000, stating the District was willing to have an outside agency participate in the evaluation. Id. Peterson stressed, however, that the process would require evaluating Sarah Pachl in her customary environments, and that the school environment should be considered one of her customary environments. (D., Ex. 76.) Peterson also offered to coordinate with the Pachls and other IEP team members in order to develop a mutually agreeable plan. Id. At the end of her letter, Peterson stated, "[w]e will not be able to proceed with your request without an evaluation plan or without your signature giving us permission to proceed with this evaluation plan." Id. Peterson sent another letter on January 25, 2000, stating she had not yet heard from the Pachls. (D., Ex. 77.) She also stated she would like to pilot the MDCFL's Student, Environment, Tasks, and Tools (SETT) process for the evaluation. Id. Peterson explained that she had been told the SETT process was an appropriate way to determine assistive technology needs. Id. The Pachls also did not respond to this letter. (IHO FF, ¶ 19.)

An IEP meeting was scheduled for February 24, 2000. Id. On February 18, 2000, Peterson sent the Pachls further information concerning the SETT process, along with a number of forms. Id. Although no one had previously explained the SETT process to Kevin Pachl, he completed all of the parent and student worksheets, and attended the meeting. (Tr. 1147 & 1161.) At the meeting, the IEP team agreed to employ the SETT process, and developed a plan for Sarah Pachl's assistive technology assessment. (IHO FF, ¶ 20.) At the conclusion of the meeting, Kevin Pachl stated he would take the plan home to review and consider with his wife. (IHO FF, ¶ 21.) Peterson told Kevin Pachl that the District would await their permission before

moving forward with the plan. Id. Kevin Pachl assumed, however, that if he did not respond within 10 days, the District would automatically begin implementation. Id.

On March 6, 2000, at Peterson's direction, Sarah Pachl's teacher and case manager Terri Kelderman sent a letter home with her asking the Pachls if they had reached a decision on the evaluation plan. (IHO FF, ¶ 22.) On March 8, 2000, Kevin Pachl responded with a letter stating his mother was ill and he would respond when he was able to regarding the proposed evaluation. Id. On March 21, 2000, Kevin Pachl followed up with a letter to Kelderman stating he expected the District to proceed with the assistive technology evaluation without his permission. (IHO FF, ¶ 23.) Kelderman faxed a copy of this letter to Peterson. Id. On March 28, 2000, Peterson responded with a letter that cited Kevin Pachl's statements at the February 24, 2000 meeting, and his March 8, 2000 note, and explained, "[w]e understood both of these communications to mean that we did not have your permission to proceed until we had heard from you." (D., Ex. 86.)[2] Peterson also proposed an additional evaluation planning meeting in this letter. Id.

On April 3, 2000, Defendants requested a local due process hearing pursuant to 20 U.S.C. § 1415(f), and Minn. Stat. § 125A.09. (IHO FF, ¶ 25.) The issues for the hearing were: (1) whether Plaintiff unduly delayed evaluating Sarah Pachl for assistive technology, and (2) whether Sarah Pachl was consequently entitled to compensatory education in the area of speech. A hearing was held before Independent Hearing Officer (IHO) Karim El-Ghazzawy, from July 28, 2000 through August 17, 2000.

The District commenced its assistive technology assessment on May 5, 2000, and

---

[2]There is also a similar letter dated March 20, 2000. (D., Ex. 84.) This letter, however, is not referenced in the IHO's Findings of Fact, nor do either of the parties mention it in their memoranda.

completed it on May 26, 2000. (IHO FF, ¶¶ 27-8.) The evaluation was performed by: (1) Brenda Mulry, a member of the District's three-person Augmentative Communication Team; (2) Melanie O'Hara, Sarah Pachl's speech and language therapist; (3) Deb Anderson, a behavior analyst, and (4) Kelderman. (IHO FF, ¶ 27.) On May 26, the District presented the Pachls with a draft version of the assessment report. (IHO FF, ¶ 28.) The Pachls objected to certain details in the report, including Sarah Pachl's use of the word "no," and the claim that she had bitten a teacher. Id. The Pachls also wanted to know whether a similar device to the SpeakEasy electronic device they used at home could be used at school. Id. On May 30, 2000, the District and the Pachls met to review the assessment. No information or devices were brought to the meeting, however. (Tr. 172-73). During the hearing, the Pachls requested an independent evaluation. (IHO FF, ¶ 29.) On May 31, 2000, the District responded to the Pachls' objections, stating that they were minor and that there was agreement on the report's substance and recommendations. (IHO FF, ¶ 29.)

On June 5, 2000, the Pachls took Sarah to the Courage Center, a certified outpatient rehabilitation center, for an independent assistive technology assessment. (IHO FF, ¶ 30.) The due process hearing on the same day was continued, pending completion of the Courage Center evaluation. Id. The evaluation was performed by Anne Marie Bailey, a speech pathologist. Id. Sarah Pachl received extended school year services from the District during the summer of 2000, but the services did not include trials of augmentative communication devices. (IFO FF, ¶ 31.)

On August 17, 2000, an IEP team met and adopted the Pachl's request to provide Sarah with an augmentative communication device. The District then adopted the Courage Center's recommendation to incorporate the TechSpeak.

**B. Hearing Testimony.**

During the hearing, testimony was provided concerning whether Sarah Pachl had progressed under her prior educational program. Barbara Hollom, a special education teacher and Sarah Pachl's case manager from September 1999 through the time she transferred to Hoover Elementary School in December 1999, stated that Sarah did progress in certain areas during the time she worked with her. (Tr. 595.)

Melanie O'Hara, an educational speech and language pathologist who worked with Sarah Pachl twice a week for five months, also stated she believed Sarah had progressed. (Tr. 660.) O'Hara explained,

> For example, if she wanted to play on the computer, she said, "Do you want computer." and I would always prompt her to say, "I want computer," and as the school year went on, she was needing less and less cuing from me. And so when she came up and said, "Do you want computer, " and I would simply say "I" and lead her in that way, and she would say, "I want computer," just from that. So she is needing less prompting in using the correct sentence structures for requesting.

(Tr, 661.) In addition, O'Hara stated that Sarah's ability to label more photographs correctly demonstrated that her vocabulary had grown. Id.

On cross-examination, however, O'Hara admitted that Sarah was only recognizing one or two pictures during each session. (Tr. 696.) O'Hara also admitted that some of the skills Sarah was learning were actually re-taught skills from prior work she had done. (Tr. 693-94.) Defendant's counsel presented O'Hara with an evaluation report for Sarah dated May 26, 2000.[3] Defendant's counsel asked O'Hara why the evaluation report recommended a communication

[3]O'Hara agreed that the date on this report was likely an error, because the report was compiled after a May 30, 2000 meeting. (Tr. 688.)

exchange system and other devices if Sarah could benefit without assistive technology. (Tr. 692.) O'Hara responded, "I think those things would certainly add to her educational experience, hopefully benefit her even more than she is already benefitting from her education." Id.

Terri Kelderman, a special education teacher and Sarah Pachl's co-case manager at Hoover, also stated that Sarah had benefitted from her education. (Tr. 426.) Kelderman explained,

> Socially, Sarah's gone – in group situations in the hallways she used to shy away from them, then she would approach the group and she would touch or explore a student physically. And towards the end of year she would just go up to the students and she would be in their personal space, but she didn't touch any more. And I think that's a big step socially for her. . . . She was able to stay on task a little bit longer at the end of the time that I worked with her in May and in the beginning of June than she was when she came in January. And we were working towards her goals of writing her name or stamping her name, that was improving, and some of the sorting things. I could get her to stay on task longer than I could at the beginning of the time that I worked with her.

(Tr. 426-27.)

On cross-examination, Defendants' counsel asked Kelderman if she could quantify any improvement in Sarah Pachls' communication from January 2000 through June 2000. Kelderman responded, "[s]he has had less screaming and I associate screaming with not being able to communicate or being frustrated with what she's doing." (Tr. 445.)

Defendants called Tanya Polkinghorn as an expert witness. Polkinghorn is a speech language pathologist and assistive technology coordinator for Children's Care Hospital and School, who participated in an independent evaluation of Sarah Pachl. Polkinghorn reviewed the District's evaluation, and testified as follows:

A I thought it was a very good start for the observations of where Sarah is currently with her communication skills, and it obviously showed that she does need some augmentative communication because her current communication skills are not functional.
Q. In your opinion, would the evaluation that the school district did determine Sarah's options for augmentative communications?
A. When I viewed this evaluation, I didn't feel it was an evaluation of augmentative communication. Again, I think it looked at observations of where she is now, but it didn't evaluate her potential use of any device or any augmentative system.

Id. at 748. Polkinghorn was then asked about Sarah Pachl's potential to learn without an augmentative electronic device. She responded, "[w]ell, just looking at, you know, her background and the test results from various years, she has tried the traditional therapies and has made very little progress in that area. Therefore, it's time to look at, you know, an alternative for her." Id. at 753.

On cross-examination, the following exchange took place:

Q. If I told you that the school district, at the outset of the planning team, with the parent, agreed to first evaluate the student's needs, determine what those needs were and then through the IEP process to determine what devices might be appropriate for that student, would your opinion change as to whether or not the school district had thoroughly evaluated the child?
A Okay. From my understanding, you are saying that you would evaluate –
Q. The school district agreed that through the evaluation they would identify needs.
A. Yes.
Q. And then it was agreed that they would go forth and develop an IEP.
Would your opinion change as to whether or not the school district did an appropriate evaluation?
A. I guess that's not enough information for me if it's just the

needs.

Q. You can't say with certainty, can you, that Sarah will make greater progress with augmentative communication devices than she would without them?

A. I can say with some degree of certainty, just looking at the small amount of progress that she made in the two-hour span that I had her and with using a device in the home setting.

Q. So would you be surprised to learn that Sarah had made progress in her educational program at school?

A. No, most children make some progress.

Q. And you didn't talk to the teachers about her progress, did you?

A. No I did not.

Q. So you really can't comment upon whether or not she made progress at school, can you?

A. Only by the reports that I looked at.

Q. And the reports don't really comment about progress, do they?

A. No.

Q. How long – you said you do two assistive technology assessments per month, right?

A. Yes.

Q. How long does it take you to conduct a thorough assessment of a child in the area of augmentative communication?

A. It varies, anyplace from two to four hours.

Id. at 764-766.

### C. IHO's Decision.

On September 25, 2000, the IHO issued Findings of Fact, Conclusions of Law, and a Decision. The IHO determined that Plaintiff had not unduly delayed in evaluating Sarah Pachl for assistive technology prior to the February 24, 2000 assessment planning meeting. (IHO Conclusion, Section I.) Specifically, the IHO emphasized that: (1) the initial delay was the result of the Pachls' request for a "stay put" in connection with a separate hearing matter; (2) there were a series of reschedulings of meetings at the Pachls' request; (3) Kevin Pachl walked out of the

August 24, 1999 and October 20, 1999 meetings; and (4) although 34 CFR 300.533(b) states an IEP team working on a reevaluation "may conduct its review without a meeting," other sections of the CFR indicate this would only be possible "where there is effective communication and cooperation between the parents and the District IEP members." Id. The IHO explained that had the parents simply been disengaged from the IEP process, the District would have been at fault for delaying. But in this case, there was close parental involvement and a stated willingness to attend meetings. Consequently, the IHO concluded that the District justifiably rescheduled meetings in order to gain parental participation. Therefore, no compensatory education was awarded for the time period between April 29, 1999 and February 24, 2000. (IHO Decision, ¶ 1.)

The IHO found, however, that Plaintiff had unduly delayed in proceeding with the assistive technology assessment once the parents had approved it on February 24, 2000. (IHO Conclusion, Section II, Decision, ¶ 2.) The IHO found that a functional IEP meeting took place on February 24, 2000. Therefore, under the Minnesota Rules, the District should have proceeded with the assessment after ten school days following the parents' receipt of the notice and response form. The IHO , citing Minn. R. 3525.2550, subp. 2.C, explained that the District should have completed the assessment within 30 days after the expiration of that ten-day parental response period. He then calculated that the evaluation should have been completed by April 10, 2000.

The IHO also found that the District's assessment itself was flawed, particularly because it failed "to expose the Student to electronic augmentative communication devices to determine which, if any, would be helpful for her." (IHO Conclusion, Section III.) Moreover, the IHO

would not accept the argument the District required over 30 days to test the devices when the Courage Center and CCHS "were able to determine in a few hours that some of the devices could indeed benefit the Student." Id. Because the District was then willing to adopt the findings of the two outside assessments, the IHO found it unnecessary to require the District to conduct its own assessment again.

The IHO found that Defendant was denied FAPE after April 10, 2000, the date on which he determined her assessment should have been completed. (IHO Conclusion, Section IV.) Specifically, the IHO stated,

> The testimony of witnesses from both sides supports the view that an augmentative communication device can aid a child with the Student's disability. Further, there is no known downside to the use of such a device; it does not, for instance, inhibit the child's development of speech. T. 753. . . . If the provision of an augmentative communication device will only help and not hurt her, there is no reason why a District possessing a library of such devices would not provide her with one. Additionally, the testimony of Ms. Polkinghorn indicated that the Student "does need some augmentative communication because her current communication skills are not functional." T. 747-748. It is clear to this hearing officer that the type of electronic augmentative communication devices recommended by the Courage Center and the Children's Care Hospital and School (CCHS), are needed in addition to the devices provided by the District.
>
> The Augmentative Communication Assessment completed by CCHS, sets forth short term communication goals using the Tech/Speak:
>
> 1. Student will be able to communicate wants and needs for choice making.
> 2. Student will communicate her medical needs.
> 3. Student will instruct caregivers of daily living needs.
> 4. Student will give information and participate in class activities.

5. Student will increase independence in the community.
6. Student will participate more fully in functional math and reading programs.
7. Student will initiate the need for toileting.
8. During work tasks Student will indicate when she is done or needs help.

> . . . It must be emphasized that the Student could not meaningfully engage in any of the above noted "short term" goals without the use of the Tech/Speak. The use of the Tech/Speak was also recommended in the Courage Center Augmentative Communication Evaluation. . . . The District provided no rationale for failing to test and provide a device of this type for the Student in a prompt manner. Additionally, it is clear that the Student was [not] in a position to be able to attain any of the short-term goals without this type of device, notwithstanding the efforts of the District. The evidence during the hearing essentially reflected that the Student was bereft of the ability to communicate meaningfully.

(IHO Conclusions, Section IV.)

Therefore, Defendant was awarded compensatory education in the area of speech for one hour per week from April 10, 2000 until the date Defendant was provided with the augmentative device. (IHO Decision, ¶ 3.)

**D. <u>HRO's Decision.</u>**

Both parties partially appealed the IHO's decision, and the Minnesota Department of Children, Families, and Learning (MDCFL) appointed Hearing Review Officer (HRO) Gregory Wright to review the matter. Defendants requested a *de novo* hearing in order to incorporate the IEP team's findings into the record. The HRO declined to do so. On January 26, 2001, the HRO issued Findings of Fact, Conclusions of Law, and a Decision. The HRO found that all of the IHO's findings of fact were supported by a preponderance of the evidence, and incorporated them into his own findings of fact. (HRO Findings of Fact (FF).) In his own findings of fact, the

HRO noted:

> On or about August 4, 1999, District Administrator Sharon Meryerring wrote Parents and stated that an assistive technology evaluation of Student would take place in the fall of 1999. There was no IEP team decision to wait until fall. (T. 1105; D. Ex. 23. Pg. 74). The family was given no explanation by District as to why the assistive technology evaluation could not be completed during the extended school year services of 1999. (T. 1106).

Id. at ¶ 3.

The HRO then partially modified the IHO's decision, finding that Plaintiff improperly delayed completing an assistive technology assessment from June 11, 1999 to May 26, 2000. (HRO Decision, ¶ 1.) The HRO acknowledged that the Pachls and the District did not see "eye to eye" on all the issues involved. (HRO Conclusions of Law, ¶ 16.) But the HRO found that this did not excuse the delay. He stated first that "[t]he IDEA does not mandate a meeting in order for an evaluation to be completed. Id. at ¶ 14. He then explained:

> [The] District could have obtained at least a modicum of parental input by requesting Parents complete a parent worksheet for the assistive technology consideration process, an example of which is found in the Minnesota Assistive Technology Guidelines, April 2000 (Student's Exhibit 00). The record is devoid of any attempt by the District to schedule conference calls or have Parents complete the above-referenced parent worksheet prior to the February 24, 2000, IEP meeting. There is no credible evidence in the record to show that Parents would have refused to cooperate in this manner. . . .
>
> The fact that Parents had requested a "stay put" during the pendency of another unrelated matter until June 2, 1999, does not mean that District could delay Parents' request for an evaluation in the assistive technology area. District was mandated under Minnesota law to proceed with the evaluation within 30 school days of Parents' request and failed to do so.

Id. at ¶¶ 15 & 17.

The HRO also found that the District had denied Sarah Pachl FAPE during the time it failed to implement an assistive technology assessment. The HRO explained as follows:

> The need for assistive technology is a determination to be made separate from the need for other related services. Thus the fact that Student may have made progress in speech and language goals while waiting for the assessment is not dispositive of whether or not Student needed assistive technology, or should have been evaluated for technology services.
>
> There is credible evidence in the record that an augmentative communication device will assist Student in communicating her needs, at least in certain environments. Both speech pathologists who evaluated Student at Courage Center and Children's Care Hospital and School found that Student could benefit from the use of such devices, including Tech/Speak.
>
> There is credible evidence in the record to support IHO's finding that District provided no rationale for failing to test and provide a device of this type for Student in a prompt manner. The evidence also supports IHO's finding that Student was not in a position to be able to attain any of the short-term goals set for her without this type of device, notwithstanding the efforts of District. IHO found that the evidence essentially reflected that Student was bereft of the ability to communicate meaningfully. Although IHO's findings above were confined to District's delay in completing an assistive technology assessment following the February 24, 2000, IEP meeting, the same rationale applies to District's failure to do so following Parents' initial request of April 29, 1999. There is credible evidence in the record to find that Student should have been provided with an appropriate augmentative communication device(s) from 30 school days following the Parents' April 29, 1999 request (calculated to be June 11, 1999).

Id. at ¶¶ 26-28.

The HRO awarded Defendant an additional hour of compensatory education for each week from June 11, 1999 until the decision was implemented. (HRO Decision, ¶ 2.)

## II DISCUSSION

**A. Standard of Review.**

The IDEA provides parents the opportunity to present complaints about a student's progress at "an impartial due process hearing." 20 U.S.C. § 1415(f)(1). The IDEA also provides that "any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency." 20 U.S.C. § 1415(g).

The Court has authority to review those earlier decisions, pursuant to 20 U.S.C. § 1415(i)(2). Specifically, the Court is required to: (1) receive the records of the administrative proceedings; (2) hear additional evidence at the request of a party; and (3) basing its decision on the preponderance of the evidence, grant appropriate relief. 20 U.S.C. § 1415(i)(2)(B). Despite this preponderance standard, the Court has an obligation to give "due weight" to the underlying administrative proceedings. Hendrick Hudson Dist. Bd. of Ed. v. Rowley, 458 U.S. 176, 206 1982). "This review is, in reality, quite narrow." Peterson v. Hastings Pub. Sch., 31 F.3d 705, 707 (8th Cir. 1994). Deference should also be afforded to the IHO's credibility determinations, given his or her unique ability to observe the demeanor of witnesses. Independent Sch. Dist. No. 283 v. S.D., 948 F. Supp. 860, 869 n.5 (D. Minn. 1995) aff'd 88 F.3d 556 (8th Cir. 1996).

The Court's review involves a two-step inquiry: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, 458 U.S. at 206-07.

Neither party disputes that Sarah Pachl is a disabled child. Therefore, under the IDEA, the District is required to provide her with a "free appropriate public education" (FAPE). 20 U.S.C. § 1412(a)(1)(A).

At the beginning of every school year, each educational agency involved must have an individual education program (IEP) in effect for each child with a disability in its jurisdiction. 20 U.S.C. § 1414(d)(2)(A). The educational program must be reasonably calculated to provide some educational benefit to the student, but it is not required to "maximize the potential of handicapped children commensurate with the opportunity provided to other children." Rowley, 458 U.S. at 198-200.

**B. Defendants' Motion for Summary Judgment.**

Defendants maintain that the HRO correctly found that Plaintiff failed to comply with the IDEA and Minnesota's procedural requirements. Defendants further state that the IEP, without an augmentative communication device, failed to provide Sarah Pachl with FAPE. Consequently, Defendants argue that the Court should uphold the HRO's decision.

Defendants contend that Plaintiff "wrongly delayed the evaluation which is required by Minnesota law within a reasonable time, and left Sarah bereft of a means of communication." Defendants cites the Minnesota Rules' requirement that an assessment requested by parents be conducted "within a reasonable time not to exceed 30 days from the date the district receives parental permission to conduct the assessment or the expiration of the ten-day parental response time in cases other than initial assessment, unless a conciliation conference or hearing is requested." Minn. R. 3525.2550, Subp.2(C). Because Plaintiff failed to comply with Minnesota's procedural requirements, and left in place an inappropriate IEP, Defendants conclude that Sarah Pachl was denied FAPE.

Defendants explain that they can not be blamed for the delay in the conducting the evaluation. Because this was not an initial assessment, Defendants argue that Plaintiff was not

required to wait for their consent. Instead, under 34 CFR 300.345(d), Plaintiff should have kept "detailed records of telephone calls made or attempted, correspondence, and records of visits made to the house, " and then proceeded without the parents.

Defendants also argue that Plaintiff's evaluation was substantively flawed. Specifically, they explain that Plaintiff never tried any of the augmentative devices during its evaluation. In addition, the evaluation was not conducted in Sarah Pachl's customary environments of home, school, and community. Therefore, it does not satisfy the requirements of 34 CFR § 300.6(a). Thus, Defendants conclude, the HRO correctly found the evaluation was flawed.

The compensatory education award was also correct, according to Defendants, because Sarah Pachl was denied FAPE. Under the IDEA provisions for civil actions, a court "shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). Defendants cite Meiner v. Missouri, 800 F.2d 749, 754 (8th Cir. 1986), for the proposition that "such relief" includes compensatory educational services. Sarah Pachl's previous IEP pointed to speech and language services. Because Plaintiff delayed in helping with her communication needs, Defendants maintain that the award of one hour of speech therapy per week for the year long denial was "very reasonable."

Defendants state that because the IHO and HRO both determined Sarah Pachl had been denied FAPE, "such a decision should not be lightly disturbed by the reviewing Court." With respect to the IHO's findings, Defendants state that he was correct to find the Pachls were "silent" following receipt of Plaintiff's February 24, 2000 proposed plan. They explain that testimony indicated that at that time Plaintiff never informed Kevin Pachl that it was not implementing Minnesota's ten-day rule. Hence, when Kevin Pachl was unable to respond

quickly, he had no way of knowing that Plaintiff would not proceed until he provided further response.

When awarding compensatory educational services, Minnesota law requires that "[t]he hearing officer's finding shall be based on a present determination of whether the child has suffered a loss of educational benefit." Minn. Stat. § 125A.09, subd. 8. The IHO found that Sarah Pachl was bereft of communication, even though her IEP pointed to speech and language services. In addition, Defendants argue that Sarah Pachl's teachers offered "meaningless subjective statements of progress." Defendants add that the IHO correctly relied on Polkinghorn's expert opinion, when finding that Sarah Pachl had suffered a loss of education as a result of not being provided with the device earlier. Accordingly, Defendants argue the IHO correctly found a denial of FAPE and awarded compensatory educational services.

Defendants state the HRO applied the correct standard of review, and then adopted the IHO's findings of fact. While the HRO did make additional findings, he merely "clarified the huge administrative record by adding 14 non-contradictory facts taken from the testimony admitted into the transcript by the IHO and from exhibits admitted into the record by the IHO." Further, Defendants note that each of the additional findings of fact was followed by citation to the record and or documentary evidence. Defendants maintain that "such clarification is precisely the role of the HRO." Defendants focus on HRO Finding No. 6, that "Parent went or attempted to go to every meeting the District had with respect to the Student from April 13, 1999 to September 14, 1999, except for a June meeting where the family was on vacation." They explain that Kevin Pachl testified to these facts, and Plaintiff raised no objections at the hearing. Further, according to Defendants, Meyerring's own testimony is consistent with the finding.

Finally, Defendants state that all relevant issues are now moot, because the compensatory services have been completed, and because the IEP team has incorporated the TechSpeak. Defendants assert that the present case is needless litigation, and it is inappropriate for Plaintiff to have brought the lawsuit at all. Consequently, they request the Court grant them summary judgment.

Plaintiff responds that the Court should deny Defendants' motion. Plaintiff asserts that Sarah Pachl was not denied FAPE during any of the time in question. Therefore, the IHO and HRO each erred in granting any compensatory educational services. Plaintiff states that although Sarah has already completed her compensatory educational services, the issues raised in this suit are not moot. Plaintiff explains that under 20 U.S.C. § 1415 (i)(3)(B), Defendants will be entitled to attorneys' fees if they are determined to be the prevailing party in this matter. Also, Plaintiff states that "this appeal is to correct the improper legal standard applied by both the IHO and the HRO regarding the school district's obligation to provide assistive technology."

With respect to the time period of April 29, 1999 through February 24, 2000, Plaintiff argues that the IHO correctly determined Plaintiff was not responsible for the delay. Plaintiff explains that the IHO correctly found the lack of parental cooperation caused the delay. The HRO, according to Plaintiff, incorrectly disregarded the IHO's conclusions and credibility determinations. Plaintiff cites Eighth Circuit law for the proposition that "if an IHO's decision is within a permissible zone of choices and supported by the evidence, it should not be interfered with."

Further, Plaintiff contests the HRO's statement that "Parent went or attempted to go to every meeting the District had with respect to the Student from April 13, 1999 to September 14,

1999, except for a June meeting when the family was on vacation." Plaintiff explains that,

> This finding (which was only supported by the Parents' own clearly disingenuous and internally inconsistent hearing testimony) is in direct conflict with the IHO's factual findings and the great weight of evidence and testimony presented at the hearing that established the Parents' lack of cooperation and obstructionist conduct in scheduling and refusing to attend any meeting the School District scheduled during this time period.

With respect to the time period of February 24, 2000 through April 10, 2000, Plaintiff states the IHO and HRO both erred as a matter of law by concluding it should have proceeded with the assistive technology assessment within ten days of the assessment planning meeting. Under 34 CFR § 300.505(a)(3)(c), a reevaluation may be performed without parental consent "if the public agency can demonstrate that it has taken reasonable measures to obtain that consent, and the child's parent has failed to respond." Plaintiff states that the Pachls did not "fail to respond" to the proposed evaluation. Instead, Plaintiff explains they indicated Plaintiff should wait for their decision before proceeding.

Even if Plaintiff could have conducted the assessment without parental consent, however, Plaintiff states that IHO and HRO erred in determining that the assistive technology evaluation should have been completed by April 10, 2000. Plaintiff explains that Minn. R. 3525.0200, subp. 2 makes clear that "days" as used in Minn. R. 3525.2550 refers to school days rather than calendar days. Thus, the assessment actually should have been completed by April 30, 2000. Plaintiff states that although it "clearly set forth this miscalculation to the HRO, the HRO did not acknowledge the IHO's error, and affirmed the IHO's calculation."

Plaintiff also maintains that both the IHO and HRO erred in determining that it failed to provide FAPE. Plaintiff argues that the IHO applied a "wouldn't hurt and might help analysis,"

to conclude that Sarah Pachl was denied FAPE. The correct analysis, however, would have been "to consider the education that the School District had already provided the Student, and the benefit she had obtained as a result of her educational program (the program that did not include an augmentative communication device)." Sarah Pachl may benefit more from her current IEP, which incorporates the TechSpeak, but that does not mean that her previous IEP failed to provide her with FAPE. Plaintiff explains,

> If IDEA obligated a school district to provide students with any service or technology that may prove helpful to them, the only time a school district could refuse a student special education or related services would be when the provision of those services would make no difference to the Student or would cause that student harm. While such an outcome may be an optimal result, it is not practical given the economic limits of most public school districts, and it is inconsistent with the manner in which the Courts have viewed this issue.

The HRO also erred, according to Plaintiff, in determining Sarah Pachl had been denied FAPE. Plaintiff isolates the following statement from the HRO's Decision:

> The need for assistive technology is a determination to be made separate from the need for other related services. Thus, the fact that the Student may have made progress in speech and language goals while waiting for the assessment is not dispositive of whether or not the Student needed assistive technology, or should have been evaluated for such technology services.

Plaintiff contends that "[u]nder the HRO's rationale, the question of whether a student lost FAPE must be applied separately to each part of the student's IEP and to each service determination made by her IEP team." This approach is incorrect, according to Plaintiff, and instead, a student's IEP must be viewed "from the perspective of the Student's entire educational program."

Plaintiff argues that both the IHO and HRO also incorrectly relied on Polkinghorn's testimony, when determining Sarah Pachl had been denied FAPE. Polkinghorn did not perform

her evaluation according to the standards of IDEA. In addition, "the goals and objectives listed on her report . . . were not IEP goals, and they were not individualized educational goals specifically identified for the Student." Plaintiff emphasizes that Hollom, O'Hara, and Kelderman all testified at the hearing that Sarah Pachl continued to learn and progress under her previous program.

In addition, Plaintiff states that the IHO found that Plaintiff agreed to adopt the recommendations from the Courage Center evaluation, therefore, "there was no basis for an objection to the School District's assessment, and the issue of the adequacy of the assessment was moot."

The Court grants Defendants' motion.

**1. Denial of FAPE.**

The Court finds that Plaintiff unduly delayed evaluating Sarah Pachl for assistive technology, and as a result, denied Sarah Pachl FAPE. The IHO found that "[t]he evidence during the hearing essentially reflected that the Student was bereft of the ability to communicate meaningfully." Both the IHO and HRO agreed on this finding, and only disagreed over who was to blame for the period of April 29, 1999 through February 24, 2000.

This finding is also consistent with the hearing transcript. Hollom stated that Sarah Pachl had progressed during the time they worked together, but she offered no evidence to support that conclusion. And while O'Hara pointed to one example of Sarah Pachl needing less prompting to employ the correct sentence structure, she admitted that this might have been a skill she had learned previously, and was only being retaught. In addition, although O'Hara stated that Sarah Pachl was able to identify more pictures than she previously had, she admitted that she was only

identifying one or two pictures per session. Finally, although Kelderman stated that Sarah Pachl was able to stay on task longer, the only improvement in communication that she testified to was that Sarah Pachl screamed less. Hence, it is difficult to conclude that Sarah Pachl was actually progressing at that time.

Plaintiff argues that the IHO relied too heavily on the testimony of Defendants' outside expert, Polkinghorn, when determining whether Sarah Pachl had received FAPE, because Polkinghorn did not confine her testimony to the requirements of the IDEA. But Polkinghorn's statement that Sarah Pachl's communication skills were not functional was a statement of fact, rather than a conclusion based on some standard other than the IDEA. Further, it was consistent with the testimony of Plaintiff's own witnesses.

The Court appreciates that given Sarah Pachl's disabilities, her progress must be measured in small increments. But Plaintiff does not argue that Sarah Pachl is impossible to educate. Therefore, it can not satisfy FAPE without demonstrating that it conferred some educational benefit. The Court is also aware that FAPE does not require maximizing a handicapped child's potential. Rowley 458 U.S. at 198-200. But an educational program must be reasonably calculated to confer some educational benefit on the student. Id. The Third Circuit has explained that "*Rowley* does not mean that the IDEA is satisfied by affording the student a *de minimis* benefit. M.C. v. Central Reg'l Sch. Dist., 81 F.3d 389, 393 (3rd Cir. 1996). In the present case, the IHO found Sarah Pachl bereft of the ability to communicate, a finding that implies Plaintiff failed to confer more than a de minimis educational benefit on Sarah Pachl. The IHO correctly concluded from this finding, that she had been denied FAPE.

Whether or not the CCHS short term communication goals are an inappropriately high

standard for FAPE, is irrelevant to the above argument. The IHO's finding that Sarah Pachl was bereft of the ability to communicate was based on testimony presented by both sides concerning her condition at the time of the hearing. The finding was merely a determination of what Plaintiff had accomplished. It was not determined by comparing her current state to what she potentially could have achieved.

Further, this case is distinguishable from Zigich v. Independent Sch. Dist. No. 623, Civ. No. 99-1212. The court, in Zigich, explained that a district is not required by the IDEA to maximize a student's progress, or to provide any piece of technology that would enhance the student's educational benefit. But when finding for the district, the court stated, "[b]oth the IHO and the HRO found, and the record supports the conclusion, that Danny made progress with his speech and language goals using this low tech program." In the present case, neither the IHO nor the HRO made such a finding. And the record does not suggest that they were incorrect. Therefore, the Court must give due weight to their determinations and affirm this finding.

**2. Delays in Conducting the Assessment.**

The HRO correctly concluded that Plaintiff was responsible for the delay starting on June 11, 1999. The HRO did not dispute the IHO's findings of fact; he instead incorporated them into his own findings of fact. The Court recognizes that the HRO's statement that one of the Pachls "went to or attempted to go to every meeting that the District had with respect to Student from April 13, 1999 to September 14, 1999, except for a June meeting when the family was on vacation,"fails to acknowledge that Meyerring proposed additional dates in August, each of which Defendants rejected. But the HRO's conclusions of law indicate that he was not displacing the IHO's findings of fact. He stated, "[a]lthough the IHO's findings above were

confined to District's delay in completing an assistive technology assessment following the February 24, 2000, IEP meeting, the same rationale applies to District's failure to do so following Parents' initial request of April 29, 1999." The HRO essentially reached a different legal conclusion from the IHO based on the same facts. Specifically, he addressed the issue of lack of parental cooperation by stating, "[t]he record is devoid of any attempt by the District to schedule conference calls or have Parents complete the above-referenced parent worksheet prior to the February 24, 2000 IEP meeting. There is no credible evidence in the record to show that Parents would have refused to cooperate in this manner."

Citing 34 CFR § 300.505(a)(3)(c), Plaintiff contends that it would only have been authorized to go forward with the evaluation without parental consent if the parents had failed to respond. Because the parents remained involved, Plaintiff concludes that this requirement was not met. But in this case, the parents were simultaneously requesting that Plaintiff conduct a reevaluation and informing Plaintiff that it did not require their presence to proceed. As early as June 11, 1999, Kevin Pachl informed Plaintiff that a meeting was not necessary for the evaluation. It would be unreasonable to conclude that this behavior gave Plaintiff less authority to conduct the evaluation than total parental inaction. Therefore, Plaintiff was authorized under the IDEA to proceed with the evaluation without the Pachls. Consequently, the HRO's conclusion was accurate.

Furthermore, there is nothing in the record indicating Plaintiff was ever actually prepared to comply with Minnesota's requirement that it proceed with the assessment following expiration of the parental response time. Both Meyerring, in her August 27, 1999 letter, and Blumstein, during the October 20, 1999 meeting, stated that Plaintiff would proceed without the Pachls. But

Plaintiff never did proceed. Prior to the February 24, 2000 meeting, Kevin Pachl was provided with parent and student worksheets enabling him to supply the information that Plaintiff maintains was necessary for it to proceed. But even after he completed these worksheets, and again informed Plaintiff on March 21, 2000 that he expected it to proceed with the evaluation without his permission, he received Peterson's March 28, 2000 letter stating Plaintiff did not believe it had his permission to proceed. And finally, Hollom stated at the due process hearing on July 31, 2000, that she had never before seen Kevin Pachl's June 11, 1999 correspondence stating he did want an assistive technology evaluation for Sarah. Clearly, the parties did not see "eye to eye" on more than one matter. And the Court recognizes that the parties' relationship was quite hostile. But Defendants repeatedly requested an assistive technology evaluation, and repeatedly informed Plaintiff that they expected it to proceed without further action on their part. Under these circumstances Plaintiff was permitted by federal law, and mandated by Minnesota law to proceed without the parents. Nevertheless, Plaintiff failed to do so. Therefore, the HRO correctly found that the same rationale should apply to delays before February 24, 2000, and after, namely that Plaintiff was responsible for all of them.

**3. Award of Compensatory Education.**

The HRO correctly determined that Sarah Pachl was denied FAPE starting on June 11, 1999. Therefore, he was also correct to award compensatory education in the area of speech for each week from that day until implementation of his decision. See Meiner, 800 F.2d at 754; Westendorp v. Independent Sch. Dist. No. 273, 35 F. Supp.2d 1134, 1136 (D. Minn. 1998) (holding "a district court may grant successful IDEA plaintiffs retrospective equitable relief, including compensatory services.")

#### 4. Calculating Days.

Any errors in the IHO's determination that the assessment should have been completed by April 10, 2000 are now irrelevant. The HRO correctly determined that Sarah Pachl should have been provided with an appropriate augmentative communication device by June 11, 1999, 30 school days after the Pachls' April 29, 1999 request.

### C. Plaintiff's Motion for Summary Judgment.

Many of Plaintiff's arguments for summary judgment are identical to the arguments it makes in opposition to Defendants' motion for summary judgment. Those arguments will not be revisited at length in this section of the Order. Plaintiff does make certain arguments in greater detail, however, and raises certain additional points. Those arguments will be fully addressed below.

#### 1. The IHO's Determination that Plaintiff Was Not at Fault for Any Delay Prior to February 24, 2000.

Plaintiff states that the IHO's determination that it was not at fault for delays prior to February 24, 2000 is supported by a preponderance of the evidence. Plaintiff emphasizes that in his findings of fact, the IHO found: (1) Defendants requested that meetings scheduled for June 22, 1999, September 14, 1999, and October 7, 1999 be rescheduled or canceled; (2) Kevin Pachl walked out of the October 20, 1999 meeting shortly after it began; (3) Sarah Pachl transferred schools in December 1999; (4) in January 2000, Plaintiff sent two letters to Defendants regarding an assessment, but neither was responded to; and (5) an assessment planning meeting occurred on February 24, 2000, which Defendants attended.

Plaintiff further argues that the IHO correctly applied the law to this case, when he stated

that any review of the previous evaluation would have to include input from the parents. The IHO then correctly cited Moubry v. Independent Sch. Dist. No 696, F. Supp.2d 1086 (D. Minn. 1998), in support of his conclusion. Moubry, according to Plaintiff, stands for the proposition that when "a school district's attempts to meet its obligation under IDEA and ensure a student's parents' full participation in the IDEA process were consistently, and perhaps intentionally, frustrated by the parents, the school district should not be held legally responsible for any delays resulting from those parents' actions."

The Court does not find that the IHO's conclusion that Plaintiff was not at fault for delays prior to February 24, 2000, was supported by a preponderance of the evidence. Hence, the HRO correctly reversed that decision. The facts demonstrate that Plaintiff should have proceeded with the assessment without requiring additional meetings with Defendants. In addition, the facts of this case are distinguishable from Moubry.

On June 10, 1999, Plaintiff provided notice of the June 22, 1999 team meeting. (D., Ex. 18.) This notice stated the purpose of the meeting would be to review existing data, discuss development of an evaluation plan, and consider development of an IEP. Under the heading, "reasons for this evaluation," the notice stated, "Sarah is due for her three year re-evaluation at this time." The notice did not mention assistive technology.

The next day, Defendants responded with a letter informing Plaintiff they would be on vacation from June 14, 1999 through July 6, 1999. (D., Ex. 19.) On the same day, Kevin Pachl sent another letter stating that he objected to a full assessment. He also stated that he wanted an assistive technology evaluation, and that this request had not been noted on the evaluation plan. In addition, Kevin Pachl provided a report from Sarah Pachl's ear specialist concerning how he

believed her middle ear difficulties might impact her learning and behavior. Finally, Kevin Pachl included notes to seven of the eight individuals who, according to the notice, would perform evaluations. Each of these notes stated whether or not Defendants believed an evaluation in that individuals' area was necessary. Some of the notes also mentioned that a single standardized test in that area would not be appropriate.

On June 12, 1999, Kevin Pachl sent an additional letter to Meyerring stating Defendants would be on vacation and unavailable on June 22, 1999. (D., Ex. 21.) The letter also stated, "[a]lthough we don't think we need to meet to discuss an assessment, we are interested in having a meeting to discuss Sarah's progress."

Plaintiff and the IHO both stated that Plaintiff could not proceed with an evaluation, because more specific information was needed first. In addition, Meyerring emphasized that assistive technology "could cover everything from a pencil holder grip to voice-activated computer technology." But in all of the correspondence that followed, even when Plaintiff referred to assistive technology, it never asked Defendants to clarify their request. Even in Meyerring's August 27, 1999 letter reminding Defendants that Plaintiff would have to proceed with an assessment plan even if they walked out of future meetings, there was no request for the additional information Plaintiff states that it needed. This is particularly problematic, given that on June 11 and June 12, 1999, Defendants demonstrated they were willing to supply other detailed information without a meeting.

Clearly, Plaintiff scheduled multiple meetings, some of which had to be rescheduled. In addition Plaintiff emphasized its legal obligations to proceed with an evaluation even if Defendants were unwilling to remain at the meetings. But this evidence suggests Plaintiff should

have considered other ways of obtaining the information it sought, as it finally did on February 18, 2000, when it sent Defendants the parent and student worksheets and instructed them to complete them.

A further problem with Plaintiff's argument, is that it shifts the burden of providing FAPE to Defendants. Plaintiff maintains that it could not determine what assistive technology to provide Sarah Pachl, because Defendants would not tell it what they wanted. But it is not the parents' obligation to determine what resources are necessary to provide FAPE. If specific assistive technology was required in order to provide Sarah Pachl with FAPE, it was Plaintiff's burden under the IDEA to make that determination. As one court explained:

> Obviously the case against the school district will be stronger if the district actually knew of the educational deficiency or the parents had complained. But a child's entitlement to special education should not depend upon the vigilance of the parents (who may not be sufficiently sophisticated to comprehend the problem) nor be abridged because the district's behavior did not rise to the level of slothfulness or bad faith. Rather, it is the responsibility of the child's teachers, therapists, and administrators–and of the multi-disciplinary team that annually evaluates the student's progress–to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly.

M.C. v. Central Reg'l Sch. Dist, 81 F.3d at 397.

Because Sarah Pachl was not provided with substantive FAPE, the present case is also distinguishable from Moubry. The IHO explained that the court in Moubry "held that a District could not be held responsible for a delay in evaluation where the delay was caused by the parents' lack of cooperation." But the Court in Moubry also agreed with the HRO's finding that the plaintiff had received FAPE during the time in question. 9 F. Supp.2d at 1105. Hence, the district had fulfilled its obligations under the IDEA. Any additional disputes over the adequacy

of the plaintiff's IEP essentially concerned maximizing his educational benefit, rather than simply providing FAPE. In a context where the district had satisfied its individual requirements under the IDEA, it was much more appropriate for uncooperative parents to share the blame.[4]

Moreover, Defendants did not prevent Plaintiff from determining what was necessary for FAPE. Defendants were not experts in assistive technology whose input was necessary to make an accurate assistive technology evaluation for purposes of FAPE. Plaintiff had additional assistive technology devices at its disposal, and could have included them in the evaluation process without detailed instruction from Defendants. Consequently, the present case is also distinguishable from those Plaintiff cites for the proposition that "a school district may not be liable for IDEA timeline violations where a parent's actions brought about those violations." See Patricia P. v. Board of Educ. Of Oak Park & River Forest High Sch. Dist. No. 200, 203 F.3d 462, 468 (7th Cir. 2000) (finding reimbursement for private school tuition not required when parent's unilateral decision to withdraw student from his public school denied the defendant an opportunity to evaluate his needs) citing Schoenfeld v. Parkway Sch. Dist., 138 F.3d 379, 382 (8th Cir. 1998); Cordrey v. Eukert, 917 F.2d 1460 (6th Cir. 1990) (finding district not at fault where parents requested a due process hearing only six days after district had offered to convene a proper IEP team meeting in response to complaint that prior meeting failed to include all the

---

[4]Additional distinguishing facts from Moubry include: (1) the time period in question was only four months; (2) the plaintiff's parent never informed the district that she believed a meeting was not necessary (3) the expert at the due process hearing testified that there was no correlation between the plaintiff's diagnosed apraxia and the reading difficulties in question; (4) at the conclusion of a related conciliation conference, the parent attempted to take the cassette used to record the conference with her and was warned that the police would be called if she did not stop; and (5) the district had already proposed specific modifications to the existing IEP to address the plaintiff's reading difficulties. 9 F. Supp.2d at 1094 & 1105.

necessary members).

### 2. The HRO's Findings of Fact.

Plaintiff argues that the HRO improperly reweighed the evidence. Specifically Plaintiff takes issue with the following findings:

1. No one from the District contacted the parents about an assistive evaluation during the summer of 1999.

Plaintiff states that this finding is completely false. It explains that Defendants canceled the June 22, 1999 meeting, and that Meyerring testified to her efforts to schedule a meeting with Defendants at the end of July and early August. Further, Meyerring's August 4, 1999 letter proposes multiple dates in August for a meeting.

Plaintiff is correct to state that there is evidence that it did contact Defendants during the summer of 1999. That fact, however, does not undermine the HRO's decision concerning the delays. The HRO did not reverse the IHO's decision on the basis that Plaintiff should have made greater attempts to schedule meetings. He reversed on the basis that Plaintiff should have attempted to obtain a modicum of input through parental worksheets or conference calls, and then proceeded with its evaluation.

2. There was no IEP team decision to wait until fall, and the family was given no explanation for why the assistive technology evaluation could not have been completed during the extended school year services of 1999.

Plaintiff states that "[t]his finding demonstrates [a] lack of attention to and appreciation for the actual events that occurred in the summer of 1999." Plaintiff reiterates that no assessment could have taken place prior to an assessment planning meeting. Such a meeting would require

observing Sarah Pachl in her school setting, and hence, require multiple staff members, "and others who would have relevant information." In addition, Plaintiff needed additional information from Defendants before proceeding. Plaintiff emphasizes that "[t]o put together this type of assessment in the summer months, when school staff are not even under contract, is a very difficult, if not impossible, task." For this reason, according to Plaintiff, the Minnesota Rules provide that only days during the regular school year are considered when determining the timeliness of assessments. Finally, Plaintiff notes that Meyerring proposed multiple meetings in August, but Defendants stated they could not attend those meetings.

Plaintiff's description of what would be necessary to conduct an assistive technology evaluation is inconsistent with the description given during the hearing. Polkinghorn testified that she could conduct a thorough assessment of a child for augmentative communication in two to four hours. (Tr. 766.) The Court recognizes that Polkinghorn may have more extensive resources than Plaintiff, which allow her to conduct a more efficient assessment. But her statement still suggests that Plaintiff could have performed the evaluation during the summer.

Plaintiff states that multiple staff members would need to be assembled, in order to perform various evaluations. In short, Plaintiff is arguing that performing an assistive technology evaluation of Sarah Pachl would have required performing a complete evaluation in all other areas as well. But Defendants were only requesting an evaluation in the area of assistive technology. Further, Defendants indicated in their June 11 and June 12, 1999 correspondence, that many of the additional areas of testing that Plaintiff proposed, such as gross motor skills, and intelligence, were not necessary, because there had been no major changes in those areas since the previous testing was done. Those other areas may have required further testing during a

larger assessment, such as the three-year reevaluation Plaintiff was pursuing. And it may be difficult to perform that larger reevaluation during the summer. But Defendants were requesting a much more limited evaluation, which could be effectively performed in a matter of hours, and without requiring the assembly of an entire staff.

3. <u>Kevin Pachl took the notice of the September 14, 1999 meeting to mean that Plaintiff would meet and come up with a plan for an assessment without Defendants present.</u>

Plaintiff states that the HRO disregarded the evidence and context in which these events took place. Plaintiff explains that it still needed Defendants' input, and consequently Meyerring's letter stated only that the IEP team would continue to meet if the parents chose to leave the meeting. Plaintiff explains "[t]he letter did not say that the team would meet if the Parent did not attend at all."

In addition, Plaintiff explains that it was Defendants who proposed the assistive technology assessment, therefore Plaintiff "was fully justified in wanting an IEP meeting with the Parents present to plan the assessment." Plaintiff adds that this exchange was consistent with a pattern in which Defendants expressed a desire to be involved but then refused to cooperate.

The Court does not find relevant the distinction between not attending a meeting, and attending but leaving a meeting. Plaintiff suggests that it still required information from Kevin Pachl, and, therefore, required him to attend the meeting at least for some time. But as the HRO noted, when faced with an apparently hostile parent, Plaintiff could have sought input without requiring attendance at the meeting.

Moreover, Defendants' understanding of this letter is not important. Both the IHO and HRO determined that additional assistive technology was necessary to provide Sarah Pachl with

FAPE. After Defendants requested an assistive technology evaluation, it was Plaintiff's obligation to conduct a sufficient evaluation to determine whether assistive technology was necessary. They maintained that obligation regardless of the message they conveyed to Defendants.

4. Defendants went or attempted to go to every meeting Plaintiff had from April 13, 1999 to September 14, 1999 except for a June meeting when the family was on vacation.

Plaintiff states that this finding in particular illustrates that the HRO reweighed the evidence and ignored the IHO's credibility determinations. Specifically, it contradicts the IHO's finding that "lack of parental cooperation" led to the series of reschedulings and aborted meetings that delayed the assessment.

As stated earlier, the HRO's conclusion concerning the delays prior to February 24, 2000 was not that the IHO misunderstood the facts of this case. The HRO did not reason that Defendants behaved admirably, and that the IHO had mischaracterized them. The HRO acknowledged that there was conflict between the parties. He then reached the different legal conclusion that in such a case, Plaintiff should have attempted to gain information by another means and then proceeded with the assessment in any case. It does not weaken this conclusion to argue that the HRO understated exactly how many meetings Defendants failed to attend.

**3. The HRO's Application of the Law.**

When addressing Defendants' motion for summary judgment, the Court discussed Plaintiff's obligation to proceed with an evaluation regardless Defendants' failure to participate. Plaintiff raises four additional arguments here: (1) there is no reason to believe Defendants would

have treated conference calls any differently from meetings; (2) when it became clear that Defendants were not responding in January, Plaintiff did send parental input forms; (3) Plaintiff did document its efforts to schedule a meeting; and (4) in the context of events occurring during 1999, Plaintiff acted reasonably and in the only way it could.

Plaintiff's first argument leaves out the HRO's other suggestion that Plaintiff should have had Defendants fill out assistive technology worksheets. There was clearly reason to believe Defendants would have treated this option differently. On June 11, 1999, Kevin Pachl supplied a detailed response to the reevaluation notice, and he also completed the worksheets that were sent to him on February 18.

Plaintiff's argument that it did eventually send forms does not implicate the HRO's reversal of the IHO or his individual application of the law. The worksheets in question were sent in preparation for the February 24, 2000 meeting. Both the IHO and HRO found that Plaintiff unduly delayed following that meeting. That conclusion, as well as Plaintiff's behavior following the February 24, 2000 meeting is discussed more fully in the section concerning Defendants' motion for summary judgment. Furthermore, Plaintiff's successful use of the worksheets in February supports the HRO's conclusion that they should have been used earlier.

The evidence clearly demonstrates that Plaintiff documented its efforts to schedule a meeting. But the purpose of compiling the records would be to allow Plaintiff to proceed without parental attendance. See 34 CFR § 300.345(d)(1).[5] Plaintiff never did so. Therefore, this additional information does not render the HRO's conclusion incorrect.

Finally, Plaintiff is incorrect to state that it acted in the only way it could during 1999.

---

[5]At the time of the HRO's decision this was 30 CFR § 300.345(d)(1).

By February 2000, Plaintiff had decided to send parent and student worksheets to Defendants. In response, Kevin Pachl completed these sheets and subsequently informed Plaintiff he believed it would proceed without his permission. This behavior is consistent with the approach the HRO found Plaintiff should have taken earlier. Plaintiff does not explain why it could not have taken this approach at any time during 1999.

**4. Delays in Evaluation After February 24, 2000.**

This issue is discussed in the section dealing with Defendants' motion for summary judgment. Plaintiff raises the additional argument that in this case, Minnesota's deadlines for conducting and completing an evaluation were in conflict with the federal regulations. Plaintiff explains that because Defendants had not failed to respond, under the IDEA it could not proceed without them. Therefore, even though Minnesota law still required proceeding with the evaluation within ten days of the meeting, doing so would have caused Plaintiff to violate federal law.

The Court finds there was no conflict of law. As was explained when addressing Defendants' motion for summary judgment, the relevant sections of the CFR did permit Plaintiff to proceed without the parents. Therefore, complying with Minnesota's requirements would not have forced Plaintiff to violate federal law.

**5. The IHO and HRO's Determination that Sarah Pachl was Denied FAPE.**

Plaintiff's arguments concerning this issue were already dealt with when addressing Defendants' motion for summary judgment.

**6. Awarding Compensatory Education.**

Plaintiff's arguments concerning this issue were already dealt with when addressing Defendants' motion for summary judgment.

**D. <u>Plaintiff's Motion to Strike Defendant's Attachments A&C</u>**

Defendants have withdrawn Attachment A. Therefore, the Court denies, as moot, this section of Plaintiff's motion.

Plaintiff states that Exhibits C-1, C-2, and C-3, to the Affidavit of Sonja D. Kerr. should be stricken from the record. All of these exhibits are MDCFL Complaint Findings in response to Defendants' Complaint No. 1009. Plaintiff quotes the IHO's statement that these findings would only be admitted at the hearing "for the very limited purpose of stating exactly what [Kevin Pachl] relied upon for not going to specific IEP meetings or behaving in a certain way." (Tr. 1045.) Further, the IHO stated that "this hearing is not about those complaints. And those complaints are separate and apart from this particular hearing in terms of the issues that are presented." <u>Id</u> at 1046. Plaintiff explains that these findings are also separate from the issue currently before the Court. Therefore, they should be stricken as irrelevant. Further, according to Plaintiff, the findings are unduly prejudicial to it, given that the MDCFL uses terminology such as "broken," "corrupt," "non-compliant," and "unlawful."

Defendants respond that these attachments are properly part of the record. Defendants explain that they are presenting these attachments to the Court for the same reason they were admitted into evidence by the IHO. According to Defendants, these attachments serve to explain why Kevin Pachl behaved in certain ways, including not attending specific IEP meeting. In addition, Plaintiff "did not specifically challenge the admission of Parent's Ex. C-1, C-2, C-3, now Attachment C, as an issue before the HRO."

The Court denies Plaintiff's motion. Attachment C was admitted into evidence by the IHO and is properly part of the record. Nevertheless, the Court only made use of Attachment C in order to explain Kevin Pachl's state of mind during the period in which meetings were being repeatedly rescheduled. The specific contents of the MDCFL Compliant Findings were not the basis for the rulings in this Order. The basis for the Court's rulings is that Plaintiff unduly delayed performing an assistive technology assessment, and consequently, Sarah Pachl was denied FAPE. The HRO and the Court found that Plaintiff, rather than Defendants, was to blame for this delay. It is irrelevant whether Plaintiff failed to provide FAPE because it did not understand its legal obligations and moved too slowly, or whether, instead, there was a problem with the IEP team process itself. If the MDCFL had found exactly the opposite facts, it would not have altered Plaintiff's obligation to provide FAPE, and would not have changed the Court's rulings.

**E. <u>Defendants' Motion to Strike Plaintiff's Affidavits.</u>**

Defendants included a "Motion to Strike Plaintiff's Affidavits" in their response to Plaintiff's motion for summary judgment. Their was no formal motion brought, but Plaintiff responded to Defendants' arguments on this matter in a separate section of its own motion to strike Attachments A & C. Despite the procedural shortcomings of this motion and response, the Court will discuss both parties' arguments.

The affidavits in question are from O'Hara, Brenda Mulry, and Kelderman, three members of Sarah Pachl's special education teaching staff. Each affidavit is dated January 15, 2002, and each contains a statement to the effect that although the IEP team adopted an augmentative communication device on August 17, 2000, the team did not do this because it

believed Sarah Pachl required the device to receive an appropriate education. Rather, the device was adopted because it might prove useful, and Plaintiff had the resources to make it available.

Defendants state these affidavits should be stricken. They quote the Court's November 26, 2001 Order concerning Defendants' motion to supplement the record. That Order stated, "the Court directs both parties to supply any written evidence that was compiled contemporaneously with the IEP team's recommendation and was created by it." Defendants emphasize that these affidavits, which were compiled on January 15, 2002, clearly are not contemporaneous written evidence. Hence, they are not authorized by the Court's Order.

Defendants argue further that Plaintiff never file a motion to supplement the administrative record, and even stipulated in the Rule 26 report that the case would be decided on the administrative record. In addition, Defendants state that none of the three affiants have been trained to use the TechSpeak. O'Hara testified at the hearing that she was not familiar with the device, and had never recommended its use for any child. Kelderman testified at the hearing that she was not trained in the use of electronic augmentative communication devices. And Mulry had never used the TechSpeak. Thus, according to Defendants, the affidavits are not made on personal knowledge, and consequently fail to satisfy Fed. R. Civ. P. 56(e).

Plaintiff responds that these affidavits must be allowed into the record. It states that the affidavits contain sufficient factual support to demonstrate the affiants possessed personal knowledge. Plaintiff explains that,

> The School District reviewed the tapes of the IEP meetings held in August 2000 and found that there was no discussion of whether the Student needed the augmentative communication device to receive educational benefit. Thus, the only way the Plaintiffs are able to rebut Defendants' allegations that the IEP team determined

> TechSpeak was necessary for Sarah is by submitting affidavits from school district personnel who attended the meeting.

The Court grants Defendants' motion. These affidavits clearly are not authorized by the November 15, 2001 Order. In addition, Plaintiff never brought a motion to supplement the administrative record. Therefore, the affidavits are not properly part of the record. In response to Plaintiff's concerns, the Court will clarify that it did not base its rulings on whether or not Sarah Pachl's team members believed the TechSpeak was necessary for FAPE. The IHO determined that Sarah Pachl had not received FAPE after hearing testimony concerning the amount of progress she made during the time period in question. The Court found that determination was supported by the evidence in the record. Thus, the IEP team's reasons for adopting the TechSpeak on August 17, 2000, had, and should have, no effect on the Court's rulings.

**THEREFORE, IT IS HEREBY ORDERED that:**

(1) Defendants' Motion for Summary Judgment (Doc. No. 20) is **GRANTED**;

(2) Plaintiff's Motion for Summary Judgment (Doc. No. 26) is **DENIED**;

(3) Plaintiff's Motion to Strike Defendant's Attachments A&C (Doc. No. 33) is **DENIED AS MOOT** with respect to Attachment A, and **DENIED** with respect to Attachment C.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

Dated: May 10, 2002.

Susan Richard Nelson

SUSAN RICHARD NELSON
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*